## The TIMKEN COMPANY

v.

## William E. SIMON, Secretary of the Treasury, et al., Appellants.

### No. 75–1177.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 20, 1976.

Decided July 7, 1976.

---

Ronald R. Glancz, Atty., Dept. of Justice, Washington, D. C., with whom Irving Jaffe, Acting Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., and Robert E. Kopp, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellants. Paul M. Tschirhart, Asst. U. S. Atty., Washington, D. C., also entered an appearance for appellants.

Frederick L. Ikenson, Washington, D. C., for appellee. Eugene L. Stewart, Washington, D. C., was on the brief for appellee.

Before McGOWAN and WILKEY, Circuit Judges, and ALBERT V. BRYAN, Jr.,* United States District Judge for the Eastern District of Virginia.

Opinion for the Court filed by Circuit Judge McGOWAN.

---

* Sitting by designation pursuant to Title 28, U.S. Code Section 292(d).

1. The Commission could reach yet a third determination—namely, that a United States industry "is prevented from being established"

McGOWAN, Circuit Judge:

The District Court enjoined the Secretary of the Treasury from refusing to impose an "antidumping duty" on certain imported goods. On appeal, the Secretary challenges both the jurisdiction of the District Court over this customs-related matter and its view of his responsibilities under the Antidumping Act of 1921. For the reasons set forth below, we affirm.

I

The Antidumping Act of 1921, 19 U.S.C. §§ 160–73 (1970 and Supp. IV, 1974), was enacted "to prevent actual or threatened injury to a domestic industry resulting from the sale in the United States market of merchandise at prices lower than in the home market (country of origin)." *J. C. Penney Co. v. Department of the Treasury,* 319 F.Supp. 1023, 1024 (S.D.N.Y.1970), aff'd, 439 F.2d 63 (2d Cir.), cert. denied, 404 U.S. 869, 92 S.Ct. 60, 30 L.Ed.2d 113 (1971). Upon receiving a complaint that foreign goods are being "dumped," the Secretary is required to determine whether that class of foreign merchandise is being sold or is likely to be sold in the United States or elsewhere at less than its fair value (LTFV)— the price on the home market. 19 U.S.C. § 160(a) (Supp. IV, 1974). If the Secretary makes an affirmative LTFV determination, he is required to advise the International Trade Commission (Commission), which in turn must notify the Secretary within three months whether an industry in the United States is being or is likely to be injured by reason of the LTFV sales.[1] *Id.* If the Commission reaches an affirmative determination, the Secretary must publish in the Federal Register both his own and the Commission's determinations, which together comprise a "dumping finding" for purposes of the Act. *Id.*

by reason of the LTFV sales. 19 U.S.C. § 160(a) (Supp. IV, 1974). That category of injury to United States industry is not at issue in this case.

■ Once a dumping finding has been published, all imported unappraised[2] merchandise described in that finding, and entered, or withdrawn from warehouse, for consumption not more than 120 days before the question was presented to the Secretary, is subject to a special antidumping duty in the approximate amount of the difference between the price of the imported merchandise sold in the United States and the price of comparable merchandise sold in the home market. *Id.* § 161(a) (1970).

To prevent importations during the pendency of the dumping complaint from being *appraised* by customs officials and thus escaping subsequent imposition of an antidumping duty, Congress enacted a provisional remedy known as withholding of appraisement. Whenever the Secretary has reason to believe or suspect that a class or kind of merchandise is being dumped, he is required to publish notice of that fact, called a withholding notice, in the Federal Register and to authorize the withholding of appraisement of such merchandise "until the further order of the Secretary, or until the Secretary has made public a [dumping] finding." *Id.* § 160(b) (Supp. IV, 1974). Merchandise covered by a withholding notice can be released by customs officials only if a bond is filed to assure payment of any antidumping duties subsequently assessed. *Id.* § 167 (1970); 19 C.F.R. §§ 153.-50–.51 (1975).

On October 31, 1973, The Timken Co. submitted a complaint that tapered roller bearings from Japan were being or were likely to be imported into the United States under circumstances justifying imposition of antidumping duties. After investigating Timken's complaint, the Treasury Department published on June 5, 1974 a notice indicating that there was reason to believe

or suspect that dumping was occurring and directed the appropriate customs officials to withhold appraisement of tapered roller bearings from Japan. 39 Fed.Reg. 19969 (1974). On September 6 of that year, the Treasury Department published a determination that tapered roller bearings from Japan were being, or were likely to be, sold at less than fair value, *id.* at 32337, and so advised the Commission. On January 23, 1975, the Commission rendered an affirmative determination to the effect that "an industry in the United States is likely to be injured" by reason of the importation of LTFV tapered roller bearings from Japan. 40 Fed.Reg. 4366.

If the Secretary of the Treasury had promptly published the dumping finding, all tapered roller bearings imported from Japan in the future and all unappraised tapered roller bearings from Japan, entered, or withdrawn from warehouse, for consumption not more than 120 days before October 31, 1973 (the date the Treasury Department received Timken's complaint) would be subject to imposition of antidumping duties.[3] Thus, tapered Japanese roller bearings entered, or withdrawn from warehouse, for consumption after June 4, 1974— the date the Secretary directed the withholding of appraisement—would be subject to imposition of antidumping duties since—. though they may have been released by customs officials pursuant to a bond—they nevertheless remained *unappraised*. This case arises precisely because the Secretary did not follow that course of action. Instead of publishing the dumping finding immediately after the Commission reached its affirmative determination, the Secretary instead directed customs officials to *appraise* all Japanese tapered roller bearings that had been covered by the withholding notice, thus removing those entries from potential imposition of antidumping duties.

2. Appraisement means the ascertainment or determination of value of imported merchandise.

3. To say that entries are *subject* to assessment of antidumping duties does not mean that antidumping duties *will be* assessed; after publication of a dumping finding, customs officials *will assess* antidumping duties *only if* they determine that the market value (or constructed value) of the particular entries is higher than the purchase price or exporter's sales price. 19 U.S.C. § 161(a) (1970).

Timken then filed a complaint in the District Court seeking injunctive and declaratory relief,[4] asserting that the Secretary acted without statutory authority in ordering appraisement prior to publication of the dumping finding of those tapered roller bearings that had been covered by the withholding notice (the "subject entries"). On February 19, 1975 the District Court entered a permanent injunction requiring the Secretary to publish a finding of dumping forthwith and to withhold appraisement of the subject entries until after publication. The Secretary appeals from this final order.[5]

## II

■ The Government first argues that the District Court lacked jurisdiction to enter the challenged order in that exclusive jurisdiction over the subject matter of Timken's complaint is vested by statute in the Customs Court. The statute upon which the Government relies is 28 U.S.C. § 1582(b) (1970),[6] which provides:

The Customs Court shall have exclusive jurisdiction of civil actions brought by American manufacturers, producers, or wholesalers pursuant to section 516 of the Tariff Act of 1930, as amended.

4. The complaint named as defendants: William E. Simon, Secretary of the Treasury; David R. MacDonald, Assistant Secretary of the Treasury; Peter O. Suchman, Deputy Assistant Secretary of the Treasury; and Vernon D. Acree, Commissioner of Customs.

5. This court stayed pending appeal that portion of the District Court order requiring the Secretary to publish a dumping finding forthwith.

6. In its Brief, the Government also suggests that the Customs Court has exclusive jurisdiction over this action under 28 U.S.C. § 1582(a) (1970), which provides:

The Customs Court shall have exclusive jurisdiction of civil actions instituted by any person whose protest pursuant to the Tariff Act of 1930, as amended, has been denied, in whole or in part, by the appropriate customs officer, where the administrative decision, including the legality of all orders and findings entering into the same, involves: (1) the appraised value of merchandise; (2) the classification and rate and amount of duties chargeable; (3) all charges or exactions of

Section 516(a) provides that an American manufacturer may file a petition with the Secretary to challenge either the failure of the Secretary to assess dumping duties or the amount of the duty actually assessed. 19 U.S.C. § 1516(a) (Supp. IV, 1974). The Government informs us that if Timken had filed such a petition the Secretary would have denied it, Brief at 31 n. 14, thus triggering the provisions of section 516(c), which authorizes American manufacturers to notify the Secretary that they desire to contest his denial of the petition. *Id.* § 1516(c). Upon receipt of that notice the Secretary is required "thereafter [to] furnish the petitioner with such information as to entries . . . of such merchandise, entered after the publication of the Secretary at such ports of entry designated by the petitioner in his notice of desire to contest, as will enable the petitioner to contest the . . . rate of duty imposed upon or failure to assess . . . antidumping duties upon . . . such merchandise in the liquidation of one such entry at such port." *Id.*

■ We think Timken is clearly correct in asserting that the case before us is not a civil action brought pursuant to section 516. That section is designed to enable American manufacturers to challenge substantive de-

whatever character within the jurisdiction of the Secretary of the Treasury; (4) the exclusion of merchandise from entry or delivery under any provisions of the customs laws; (5) the liquidation or reliquidation of an entry, or a modification thereof; (6) the refusal to pay a claim for drawback; or (7) the refusal to reliquidate any entry under section 520(c) of the Tariff Act of 1930, as amended. *See* Brief at 18–21. Timken responds, correctly we think, that 28 U.S.C. § 1582(a) relates to *protests* filed by *importers*, not American manufacturers, pursuant to section 514, rather than section 516, of the Tariff Act of 1930. Brief at 10 n. 6; *see Fritz v. United States,* 535 F.2d 1192, at 1195 (9th Cir. 1976). The Government's Reply Brief fails to answer Timken's point; in fact, the Reply Brief makes no reference at all to 28 U.S.C. § 1582(a) (1970). Moreover, at oral argument the Government referred only to 28 U.S.C. § 1582(b) (1970) in contending that the Customs Court has exclusive jurisdiction over this action.

cisions by the Secretary with respect to the need for or the amount of antidumping duties. The section is structured to enable the petitioning manufacturer to challenge one entry per port, and to use that entry as a vehicle to obtain Customs Court review of the merits of the Secretary's determination. While the matter is pending before the Customs Court, duties are assessed according to the decision of the Secretary, *id.* § 1516(e), and the Customs Court decision has prospective effect only, *id.* § 1516(g).

Of course, in bringing this action Timken hopes to have antidumping duties assessed on the entries that have been covered by the withholding notice. But that fact does not magically convert this action into a civil action brought pursuant to section 516. The gravamen of Timken's complaint is that the Secretary has acted beyond his statutory authority in revoking the withholding of appraisement notice and ordering appraisement of the subject entries prior to his publication of a dumping finding.

If section 516 enabled Timken to get judicial review of that issue in the Customs Court, we would not hesitate to reverse the District Court's assertion of jurisdiction in this case. But the Government has been unable, both in its written submissions and at oral argument, to indicate how it is that Timken can get relief under section 516.

■ As outlined above, it is clear that section 516 subjects to Customs Court review only certain entries that occur *after* the date of the Secretary's adverse ruling on an American manufacturer's section 516 petition. The entries at issue in this case have already taken place, and nothing in section 516 can get them before the Customs Court. Moreover, as Timken notes, once a dumping finding is published and future entries become subject to antidumping duties, Timken may actually agree with the amount of duty assessed on those future entries. *See* note 3 *supra.* The question presented in this action is simply a question outside the scope of section 516.[7]

7. The Government contends that there is substantial case authority for the contention that the Customs Court has jurisdiction over the subject matter of this complaint. We have examined those cases carefully, and we conclude that they have no direct bearing on the question before us. The cases cited by the Government indicate that the federal district courts are without jurisdiction to adjudicate matters as to which there is exclusive jurisdiction in the Customs Court. *See, e. g., Fritz v. United States,* 535 F.2d 1192 (9th Cir. 1976); *J. C. Penney Co. v. Department of the Treasury,* 439 F.2d 63 (2d Cir.), *cert. denied,* 404 U.S. 869, 92 S.Ct. 60, 30 L.Ed.2d 113 (1971); *North American Cement Corp. v. Anderson,* 109 U.S. App.D.C. 162, 284 F.2d 591 (1960); *Eastern States Petroleum Corp. v. Rogers,* 108 U.S.App. D.C. 63, 280 F.2d 611 (D.C.Cir.), *cert. denied,* 364 U.S. 891, 81 S.Ct. 222, 5 L.Ed.2d 187 (1960); *Morgantown Glassware Guild v. Humphrey,* 98 U.S.App.D.C. 375, 236 F.2d 670 (D.C. Cir.), *cert. denied,* 352 U.S. 896, 77 S.Ct. 133, 1 L.Ed.2d 87 (1956). But the fact that federal courts will not interfere with cases reviewable in the Customs Court does not mean that the case *sub judice* is reviewable in that court, and our analysis of section 516 indicates otherwise.

Nor do we think the Government's position is supported by the cited cases indicating that the Customs Court has exclusive jurisdiction over certain controversies involving the Antidumping Act. *See, e. g., North American Cement Corp. v. Anderson, supra* ; *Horton v. Hum-*

*phrey,* 146 F.Supp. 819 (D.D.C.), *aff'd,* 352 U.S. 921, 77 S.Ct. 224, 1 L.Ed.2d 157 (1956). Surely the Government recognizes that the fact that the Customs Court has jurisdiction to entertain a wide variety of suits involving antidumping duties, especially those brought pursuant to section 516, does not mean that all cases involving the Antidumping Act fall within the statutory grant of jurisdiction to that court.

More on point, in our view, are those cases indicating that the federal district courts can assert jurisdiction, under appropriate jurisdictional grants, over customs-related matters in which no adequate remedy exists in the Customs Court. *See, e. g., J. C. Penney Co. v. Department of the Treasury, supra,* 439 F.2d at 68; *United States v. Hammond Lead Products,* 440 F.2d 1024, 58 C.C.P.A. 129, *cert. denied,* 404 U.S. 1005, 92 S.Ct. 565, 30 L.Ed.2d 558 (1971); *cf. Waite v. Macy,* 246 U.S. 606, 38 S.Ct. 395, 62 L.Ed. 892 (1918); *Cottman Co. v. Dailey,* 94 F.2d 85, 89 (4th Cir. 1938). Since Timken has *no remedy* pursuant to section 516 in the Customs Court, we decline to hold that the District Court lacked jurisdiction over this action.

Timken asserts that the District Court had jurisdiction over this action pursuant to a number of statutory provisions, including 28 U.S.C. §§ 1331, 1340, 1361 (1970) and 5 U.S.C. §§ 702–06 (1970). We have no doubt that the District Court had jurisdiction, especially pursuant to either the mandamus statute or the Administrative Procedure Act, to entertain an action to

The Government urges an alternative jurisdictional argument, namely, there is an implied statutory preclusion of judicial review with respect to customs-related matters other than those reviewable in the Customs Court under section 516. *But see* 28 U.S.C. § 1340 (1970).

█ We find the argument to be without merit. It runs squarely into the powerful presumption of reviewability, which can be rebutted only if there is "clear and convincing evidence" that Congress intended to insulate agency action from review. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). *Accord, e. g., Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Tooahnippah v. Hickel*, 397 U.S. 598, 90 S.Ct. 1316, 25 L.Ed.2d 600 (1970). We have examined the legislative history cited by the Government, and we find no persuasive evidence indicating that nonreviewability was intended with respect to cases such as the one before us.

The Government relies quite heavily on Congress' refusal for a number of years to give American manufacturers the right to protest the amount of duties assessed on imported goods. We do not dispute the accuracy of the Government's historical observations, but we think they have little bearing on the question of nonreviewability. In giving American manufacturers a right to protest certain assessments of duties, Congress enacted a detailed procedural scheme and mandated that the Secretary perform certain functions to assure the effectiveness of that program. The fact that Congress delayed establishing the scheme does not mean that it somehow intended to insulate from judicial review the failure of the Secretary to act in accordance with his statutory responsibilities. Indeed, expressly requiring the Secretary to perform a number of ministerial functions suggests

that Congress intended that the doors of the courts be open for actions in the nature of mandamus.

The one other aspect of the legislative history on which the Government relies is the conference report accompanying the Tariff Act of 1922. In explaining section 516 of the 1922 Act—the predecessor of section 516 of the 1930 Act—the Report notes:

> If the American manufacturer, producer, or wholesaler is not satisfied with the appraiser's action, he may, under subdivision (a) of section 516, file an appeal for reappraisement or file a protest under the provisions of subdivision (b).

H.R.Rep.No.1207, 67th Cong., 2d Sess. 157 (1922). That report merely emphasizes what the language of section 516 itself indicates: challenges to substantive decisions of the Secretary must be filed in the Customs Court pursuant to that court's grant of exclusive jurisdiction over section 516 actions. But, as we noted earlier, this is not an action to challenge a substantive decision of the Secretary as to the amount of a duty assessed or the failure to impose a duty. There is simply no clear and convincing evidence in the cited portion of the conference report that Congress intended to bar American manufacturers from seeking judicial relief when the Secretary acts beyond his statutory authority.

### III

As we noted earlier, whenever the Commission is advised by the Secretary that a class of merchandise is being or is likely to be sold in the United States or elsewhere at LTFV, it is required by statute to investigate and determine whether an industry in the United States (a) *is being injured,* or (b) *is likely to be injured* by reason of the LTFV sales. If the Commission makes an affirmative determination, the Secretary is

require the Secretary to perform statutory duties of a ministerial nature. *See Haneke v. Secretary of HEW*, 535 F.2d 1291, 1294–1296 (D.C.Cir. 1976). And we note in this regard that, other than its arguments concerning ex-

clusive Customs Court jurisdiction and implied statutory preclusion of judicial review, *infra,* the Government does not challenge the jurisdiction of the District Court to entertain this action.

required by statute to publish a dumping finding, thus subjecting that class of merchandise to assessment of antidumping duties. The Secretary argues that he has statutory authority to terminate a withholding notice prior to publication of a dumping finding when the Commission's determination goes only to "likelihood of injury." Timken, on the other hand, contends that the Secretary is required to publish his dumping finding prior to termination of the withholding notice whenever the Commission makes an *affirmative* determination, whether based on actual injury or likelihood of injury.

In deciding this question, we start by noting that Section 201(b) of the Antidumping Act specifically provides that the withholding notice is to remain in effect "until the further order of the Secretary, or until the Secretary makes public a [dumping] finding." 19 U.S.C. § 160(b)(1)(B) (Supp. IV, 1974). The question we must resolve is whether the Secretary has authority, under the "until the further order of the Secretary" language, to terminate the withholding notice prior to the publication of the dumping finding, thus allowing entries that had been covered by the notice to be appraised without assessment of antidumping duties.

■ Based on the statutory language alone, we would conclude as does Timken, that the "until the further order of the Secretary" language was intended to cover *only* those situations in which the Secretary is unable to publish a dumping finding, either because the Secretary has reached a negative LTFV determination (and therefore has not referred the complaint to the Commission), or because the Commission has concluded that the relevant United States industries are neither being nor are likely to be injured by the LTFV sales. If a dumping finding is not to be published, continued withholding of appraisement as a provisional remedy is unnecessary, and the Secretary therefore has authority to terminate the withholding notice under those circumstances.

The reasonableness of that construction is suggested by the fact that until 1972 the Treasury Department so interpreted the statute. Prior to that year, the Secretary drew no distinction based on the difference between Commission determinations of actual injury and likelihood of injury; in all cases, withholding of appraisement notices were allowed to expire only after the Secretary published his dumping finding. *See, e. g., Portland Cement from the Dominican Republic*, T.D. 55883 (1963) and *Steel Jacks From Canada*, T.D. 66191 (1966), in both of which dumping findings were based on "likelihood of injury" determinations and dumping duties were retroactively assessed on entries covered by the withholding notices.

The Secretary's 1972 departure from this interpretation was apparently prompted by certain provisions of the International Antidumping Code of 1967, to which the United States is a party. Article 11 of the Code deals specifically with the problem before us:

Antidumping duties and provisional measures shall only be applied to products which enter for consumption after the time when the decision taken under Articles 8(a) and 10(a), respectively, enters into force, except that in cases:

(i) Where a determination of material injury (but not of a threat of material injury, or of a material retardation of the establishment of an industry) is made or where the provisional measures consist of provisional duties and the dumped imports carried out during the period of their application would, in the absence of these provisional measures, have caused material injury, antidumping duties may be levied retroactively for the period of which provisional measures, if any, have been applied.

Although Article 11 appears to authorize the Secretary to proceed as he did, we must nevertheless determine the scope of the Secretary's authority under section 201(b) of the Antidumping Act of 1921, since with respect to matters covered by both the Code and the Act, Congress has directed the Sec-

retary to give effect to the Code only insofar as it is not inconsistent with the Act.[8]

To support its contention that the Secretary's actions in this case are authorized by the "until further order of the Secretary" language of section 201(b) of the Antidumping Act, counsel for the Government offered a complex and, in our view, completely unrealistic analysis of the antidumping regulatory scheme.[9] Once the Commission has been advised by the Secretary that LTFV sales are being made or are likely to be made, the Commission investigates to determine the impact of those sales on the economic status of the relevant United States industry. Counsel for the Government represented to the court several times at oral argument that in making its injury determination the Commission does not have before it any information with respect to those entries which have been subject to a withholding notice; the only information before the Commission concerns those entries which occurred before the case was referred to the Commission by the Secretary.[10]

On the basis of information submitted by interested parties and collected by its staff,

the Commission decides, so we are informed by the Government, whether there is either a present or future injury. In making a future injury determination, the Commission decides, we are told, whether there will be an injury as of the date the Secretary publishes a dumping finding.[11]

The Government goes on to contend that "[t]wo elements are essential to the imposition of dumping duties: sales at less than fair value and injury." Brief at 53. Since the Commission reached a "likelihood of injury" determination in this case, thus indicating future injury, and since the Commission did not have before it for consideration the entries covered by the withholding notice, the Government concludes that "one of the two prerequisites for the imposition of dumping duties is lacking on merchandise entered *before* a likelihood determination is made"—namely, the injury element.[12] *Id.* (emphasis in original).

We think the Government's analysis of the statutory framework has a number of serious analytical flaws. In the first place, the present injury and future injury approach is unrealistic. It is foolish to pretend that the Commission can predict fu-

---

**8.** Pub.L.No.90–634, § 201(a), 82 Stat. 1347 (1968) provides:
   Nothing contained in the International Antidumping Code, signed at Geneva on June 30, 1967, shall be construed to restrict the discretion of the United States Tariff Commission in performing its duties and functions under the Antidumping Act, 1921, and in performing their duties and functions under such Act the Secretary of the Treasury and the Tariff Commission shall—
   (1) resolve any conflict between the International Antidumping Code and the Antidumping Act, 1921, in favor of the Act as applied by the agency administering the Act, and
   (2) take into account the provisions of the International Antidumping Code only insofar as they are consistent with the Antidumping Act, 1921, as applied by the agency administering the Act.

**9.** One gets only a glimpse of the thrust of the Government's position in its brief, but a full explanation was provided at oral argument.

**10.** Since it is possible for the Secretary to publish a withholding notice prior to referring a complaint to the Commission, 19 C.F.R. §§ 153.34, 153.36 (1975), the Government's description of the information before the Com-

mission leaves us in doubt as to whether it includes entries which are covered by a withholding notice and which occurred prior to the date the complaint was referred to the Commission.

**11.** There is usually a time lag of several weeks between the date of the Commission's determination and the date the Secretary eventually publishes a dumping finding. Brief for Appellee at 36.

**12.** As we noted earlier, there is often a time lag between the date the Commission makes a determination and the date the dumping finding is published. *See* note 11 *supra.* If we read the quoted portion of the Government's Brief literally, it suggests that entries covered by a withholding notice and taking place during that time lag are eligible for assessment of antidumping duties. Since the Government argued that the Commission's future injury determination speaks as of the date of the publication of a dumping finding by the Secretary, *see* text and note at note 11 *supra,* we read the quoted portion of the Brief to refer to entries occurring before the latter date.

ture injury with certainty; indeed, the word "likelihood" suggests prediction given conditions of uncertainty. Counsel for the Government nevertheless persisted at oral argument in maintaining that a Commission likelihood determination can be interpreted to mean that, although there is no injury at the end of business today, there will be injury at the opening of business tomorrow. The unreality of that description is plain.

Second, the Government's interpretation leads to relatively absurd results. For example, under some circumstances entries subject to a withholding notice would apparently be placed in a regulatory vacuum. This occurs when the Commission, as here, decides that there is no present injury as of the time the Secretary referred the case to the Commission, and that there will be injury after the Secretary publishes a dumping finding. *See* text accompanying note 11 *supra.* Since the entries at issue here entered after the case was referred to the Commission but before the Secretary could ever publish a dumping finding, there is simply no way the Commission could make either a present injury or a likelihood of injury determination with respect to those goods. In that sense, they are apparently insulated from review.

Our third problem with the Government's theory is that even a small sampling of published Commission injury determinations suggests that the Commission does not take so narrow a view of the issues presented to it for consideration. *See, e. g., Concord Grapes from Canada,* 34 Fed.Reg. 12927 (1969) ("[The Antidumping Act] is designed to stop present violations and to prevent them in the future. Of course, time must be allowed for the normal processes of industry to produce a complaint and to process [the complaint] through the Treasury Department so that the present tense term 'is being injured' cannot be applied in a strictly technical sense. Judgment must always be made on past events. . . . *[T]he judgment which we make must bear some reasonable relationship to what is presently going on in*

*the marketplace.'* ") (Views of Commissioner Clubb) (emphasis added). Whole Dried Eggs from Holland, 35 Fed.Reg. 12501 (1970) ("[A] U.S. industry . . . *is threatened with future injury* if such imports . . . at less than fair value are permitted *to continue.*") (Statement of Commissioners Clubb and Moore) (emphasis added).

Fourth, we find it difficult, indeed impossible, to reconcile the Government's present interpretation of the statute with its prior willingness to assess antidumping duties retroactively even though the Commission had reached only a "likelihood of injury" determination. *See, e. g., Portland Cement from the Dominican Republic, supra* ; *Steel Jacks from Canada, supra.* If the injury element is, as the Government contends, "essential" to the imposition of antidumping duties, and if, as the Government argues, the "likelihood of injury" determination goes only to future injury, the Government is in effect suggesting that it acted unlawfully prior to 1972 in retroactively assessing antidumping duties based on "likelihood of injury" determinations. Finally, and perhaps most important, the Government is unable to point to anything in the legislative history of the Antidumping Act which supports a denial of retroactive relief based solely on the fact that the Commission reached a "likelihood of injury" determination.

These difficulties lead us to reject the Government's explanation of the antidumping regulatory scheme. We are inclined instead to pursue a simple and straightforward approach to the statutory language and its relationship to the rest of the statute. We start with section 201(a) of the Act, which authorizes the imposition of antidumping duties whenever the Commission concludes that a United States industry is being or is likely to be injured as a result of LTFV sales. 19 U.S.C. § 160(a) (Supp. IV, 1974). As to "likelihood of injury" determinations, we think they are exactly what they purport to be: predictions, based on past experience, that a domestic industry faces a *threat* of economic injury. They are

not statements that injury will definitely occur, but rather a way of stating that, although the Commission cannot conclude with certainty that injury is occurring, it can nevertheless conclude that there is such a risk of injury that antidumping duties should be assessed. Entries taking place during the pendency of the Commission's determination are as much a part of that "threat" as entries occurring after publication of a dumping finding, and fall just as neatly within the congressional intent to *prevent* injury through dumping. *See supra*, p. —— of 176 U.S.App.D.C., p. 223 of 539 F.2d.

Moreover, we must recognize, as has the Commission, that antidumping duties are designed to deter would-be dumpers. *See, e. g., Potassium Chloride from Canada, France, and West Germany*, 34 Fed.Reg. 19005 (1969) ("[Antidumping duties] are intended to be imposed retroactively as well as prospectively, and are to be applied irrespective of whether they are remedial in the case at hand. They are designed to deter would-be dumpers.") (footnotes omitted). Under the Government's interpretation, that deterrent effect would be undermined to some extent insofar as a would-be dumper could dump with knowledge that importations merely threatening injury would not be subject to antidumping duties prior to the publication of a dumping finding.

We therefore conclude that the Secretary does not have authority under the Antidumping Act to insulate entries subject to a withholding notice from potential assessment of antidumping duties by terminating the withholding notice prior to publication of a dumping finding based on a "likelihood of injury" determination. As we indicated earlier, the "until further order of the Secretary" language deals *only* with situations in which a dumping finding is not published; that language does not give the Secretary the authority to proceed as he did in this case. Moreover, since

Article 11 of the Code conflicts with the Secretary's statutory responsibilities, the Code must give way.[13]

We note as a final matter that nothing in this opinion deals with the question of congressional power to amend the Antidumping Act to conform to Article 11 of the Code. We hold only that section 201(b) of the Act as presently worded does not authorize the Secretary to prevent retroactive assessment of dumping duties on the entries at issue in this case. The decision of the District Court is therefore affirmed.

*It is so ordered.*

---

**13.** Given this disposition of the appeal we need not consider whether the United States has implemented the Code as part of our statutory law. *Compare* Brief for the Government at 49–52 *with* Brief for Timken at 37 n. 18.