## SCM CORPORATION

### v.

### UNITED STATES (Brother International Corporation, Party-in-Interest).

**C.R.D. 78–2; Court No. 77–4–00553.**

United States Customs Court.

May 11, 1978.

See also, Cust.Ct., 435 F.Supp. 1224.

Stewart & Ikenson, Washington, D. C. (Eugene L. Stewart and Frederick L. Ikenson, Washington, D. C., of counsel), for plaintiff.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C. (David M. Cohen, Chief, Customs Sec., and Glenn E. Harris, New York City, trial atty.), for defendant.

Tanaka, Walders & Ritger, Washington, D. C. (H. William Tanaka and Lawrence R. Walders, Washington, D. C., of counsel), for party-in-interest.

RE, Chief Judge.

■ Plaintiff, SCM Corporation ("SCM"), an American manufacturer, by this action seeks to review under section 516(c) of the Tariff Act of 1930, as amended, the failure of the Secretary of the Treasury not to assess dumping duties upon the importation from Japan of portable electric typewriters. It has moved under Rule 1.1(b) of the rules of this court for a determination whether this court has subject matter jurisdiction over this action.[1]

■ Rule 1.1(b) provides that "[w]here, in any proceeding or in any instance, there is no applicable rule of procedure, the judge or judges, before whom the action is pending, may prescribe the same." Although Rule 4.7(b)(2) provides defendants with the defense of lack of subject matter jurisdic-

---

1. Since the federal courts have only that jurisdiction conferred by the Constitution or Congress, it is fundamental that any party, even one who originally asserted jurisdiction, can protest the lack of subject matter jurisdiction. *See American Fire and Casualty Co. v. Finn,* 341 U.S. 6, 71 S.Ct. 534, 95 L.Ed. 702 (1951); *Mansfield, C. & L. M. Ry. v. Swan,* 111 U.S. 379, 382, 4 S.Ct. 510, 28 L.Ed. 462 (1884); *Resnik v. LaPaz Guest Ranch,* 289 F.2d 814 (9th Cir. 1961); 1 Moore's Federal Practice ¶ 0.60[4] (1977).

tion, there is no equivalent procedure by which *plaintiffs* may contest subject matter jurisdiction.[2] SCM has moved under Rule 1.1(b) because, while invoking the court's jurisdiction by bringing this action, it nevertheless deems it necessary to contest the jurisdiction of the court. Even though not specifically provided for in the rules of this court, SCM's motion will nonetheless be entertained and considered. *See Rubberset Co. v. United States,* 68 Cust.Ct. 370, C.R.D. 72–9, 342 F.Supp. 749 (1972). Since, by this motion, SCM contests the jurisdiction of the court, the motion will be treated as a motion to dismiss for lack of subject matter jurisdiction.

A brief history of this litigation, and the statutory scheme under which it arose, is necessary to understand the nature and purpose of plaintiff's motion.

This case arises under the Antidumping Act of 1921, 19 U.S.C. § 160 *et seq.* (1970 & Supp. V 1975) ("Antidumping Act"), which was enacted to prevent actual or threatened injury to a domestic industry resulting from sales of imported merchandise in the United States at prices lower than in the country of origin. *J.C. Penney Co. v. United States Department of Treasury,* 319 F.Supp. 1023, 1024 (S.D.N.Y.1970), *aff'd,* 439 F.2d 63 (2d Cir. 1971), *cert. denied,* 404 U.S. 869, 92 S.Ct. 60, 30 L.Ed.2d 113 (1971); *Timken Co. v. Simon,* 176 U.S.App.D.C. 219, 539 F.2d 221 (1976). An affected American manufacturer, producer or wholesaler has the right to file a complaint with the Secretary of the Treasury ("Secretary") alleging that a class of foreign merchandise is being "dumped" in the United States. 19 U.S.C. § 1516 (Supp. V 1975). The Secretary is then required to determine whether the foreign merchandise is actually being sold at a lower price in this country than in the home market, i. e., whether the sales are at less than fair value (LTFV). Whenever the Secretary finds sales at LTFV, he advises the United States International Trade Commission ("ITC"), which has three months to

determine "whether an industry in the United States is being or is likely to be injured, or is prevented from being established, by reason of the importation of such merchandise into the United States." If the ITC makes an affirmative injury determination, the Secretary must publish a notice of his and the ITC's determinations in the Federal Register. This publication constitutes the "dumping finding." The finding must include a description of the class or kind of merchandise to which it applies in such detail as may be necessary for the guidance of customs officers. 19 U.S.C. § 160(a).

When the "dumping finding" has been published, all unappraised merchandise described in the finding, entered or withdrawn from warehouse for consumption, not more than 120 days before the question was presented to the Secretary, is subject to special dumping duties. The amount of the dumping duties is the difference between the value of the merchandise in the foreign market, and the purchase or exporter's sales price, i. e., the "dumping margin." 19 U.S.C. § 161(a). Dumping duties will not necessarily be assessed merely because the imported merchandise has been the subject of a dumping finding. Customs officials will assess dumping duties on an entry by entry basis, and only if they find a "dumping margin."

If the Secretary finds no LTFV sales, or if the ITC makes a negative injury determination, no dumping finding can be published and no dumping duties can be assessed. For a brief summary of the provisions of the Antidumping Act, see *SCM Corporation v. United States (Brother International Corporation, Party-in-Interest),* 79 Cust:Ct. 163, C.R.D. 77–6, 435 F.Supp. 1224 (1977), which denied plaintiff's motion for assignment of this action to a three-judge panel.

Under the Antidumping Act, dumping duties can be assessed only against *unappraised* merchandise. Congress, therefore, provided the provisional remedy known as

---

**2.** The Federal Rules of Civil Procedure provide that "[w]henever it appears by suggestion of the parties or otherwise that the court lacks

jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3).

"withholding of appraisement" to prevent importations during the pendency of the dumping investigation from being appraised by customs, and thus escaping subsequent imposition of dumping duties. Whenever the Secretary has reason to believe or suspect that a class of merchandise, as to which a finding has not been made public, is being sold at LTFV, i. e., being "dumped," he shall publish in the Federal Register what is called a withholding notice. An appraisement is withheld until further order, or until a dumping finding has been published. 19 U.S.C. § 160(b).

Pursuant to the Antidumping Act, SCM filed a complaint with the Secretary on February 14, 1974, alleging that portable electric typewriters from Japan were being "dumped" in the United States. Notice of pendency of a dumping investigation was published on March 20, 1974. Notice providing for withholding of appraisement followed on December 20, 1974. On March 20, 1975, Assistant Secretary of the Treasury Macdonald published a notice that sales of portable electric typewriters from Japan were being or were likely to be made at LTFV. 40 Fed.Reg. 12685 (1975). The ITC, advised of the Secretary's determination, held hearings in May of 1975, and on June 19, 1975 by a 3–2 vote, one Commissioner abstaining, rendered a negative determination of injury. The negative injury determination was published on June 26, 1975. 40 Fed.Reg. 27079 (1975). As a re-sult of the negative injury determination by the ITC, the Secretary of the Treasury had no authority to publish a dumping finding or to assess dumping duties. Accordingly, he authorized the appraisement of the typewriters which were subject to withholding of appraisement pending the outcome of the dumping investigation.

SCM sought to contest the negative injury determination of the ITC. It commenced an action in the United States District Court for the District of Columbia seeking to set aside the negative injury determination of the ITC, and requested preliminary injunctive relief. *SCM Corporation v. United States International Trade Commission et al.*, 404 F.Supp. 124 (D.D.C. 1975). The jurisdictional basis for the action was 28 U.S.C. § 1340 (1970), which provides that "[t]he district courts shall have original jurisdiction of any civil action arising under any Act of Congress providing for internal revenue, or revenue from imports or tonnage except matters within the jurisdiction of the Customs Court." The jurisdiction of the United States Customs Court over actions by American manufacturers is found in 28 U.S.C. § 1582(b) (1970), which provides that "[t]he Customs Court shall have exclusive jurisdiction of civil actions brought by American manufacturers, producers, or wholesalers pursuant to section 516 of the Tariff Act of 1930, as amended." [3]

---

3. Section 516 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516 (Supp. V 1975), reads as follows:

"(a) The Secretary shall, upon written request by an American manufacturer, producer, or wholesaler, furnish the classification, the rate of duty, the additional duty described in section 1303 of this title (hereinafter in this section referred to as 'countervailing duties'), if any, and the special duty described in section 161 of this title (hereinafter in this section referred to as 'antidumping duties'), if any, imposed upon designated imported merchandise of a class or kind manufactured, produced, or sold at wholesale by him. If such manufacturer, producer, or wholesaler believes that the appraised value is too low, that the classification is not correct, that the proper rate of duty is not being assessed, or that countervailing duties or antidumping duties should be as-sessed, he may file a petition with the Secretary setting forth (1) a description of the merchandise, (2) the appraised value, the classification, or the rate or rates of duty that he believes proper and (3) the reasons for his belief including, in appropriate instances, the reasons for his belief that countervailing duties or antidumping duties should be assessed.

(b) If, after receipt and consideration of a petition filed by an American manufacturer, producer, or wholesaler, the Secretary decides that the appraised value of the merchandise is too low, that the classification of the article or rate of duty assessed thereon is not correct, or that countervailing duties or antidumping duties should be assessed, he shall determine the proper appraised value or classification, rate of duty, or countervailing duties, or antidumping duties and shall notify the petitioner of his determination. Except for countervail-

■ These statutes make it clear that if a civil action is within the exclusive jurisdiction of the United States Customs Court, it cannot be brought in the district courts. *E. g., Consumers Union of United States, Inc. v. Committee for Implementation of Textile Agreements,* 561 F.2d 872 (D.C. Cir. 1977), *cert. denied,* 435 U.S. 933, 98 S.Ct. 1509, 55 L.Ed.2d 531 (1978); *Fritz v. United States,* 535 F.2d 1192 (9th Cir. 1976). Since the defendants in the district court maintained that the United States Customs Court had jurisdiction under the provisions of section 516, it moved to dismiss SCM's

ing duty and antidumping duty purposes, all such merchandise entered for consumption or withdrawn from warehouse for consumption more than thirty days after the date such notice to the petitioner is published in the weekly Customs Bulletin shall be appraised or classified or assessed as to rate of duty in accordance with the Secretary's determination. For countervailing duty purposes, the procedures set forth in section 1303 of this title shall apply. For antidumping duty purposes, the procedures set forth in section 160 of this title shall apply.

(c) If the Secretary decides that the appraised value or classification of the articles or the rate of duty with respect to which a petition was filed pursuant to subsection (a) of this section is correct, or that countervailing duties or antidumping duties should not be assessed, he shall so inform the petitioner. If dissatisfied with the decision of the Secretary, the petitioner may file with the Secretary, not later than thirty days after the date of the decision, notice that he desires to contest the appraised value or classification of, or rate of duty assessed upon or the failure to assess countervailing duties or antidumping duties upon, the merchandise. Upon receipt of notice from the petitioner, the Secretary shall cause publication to be made of his decision as to the proper appraised value or classification or rate of duty or that countervailing duties or antidumping duties should not be assessed and of the petitioner's desire to contest, and shall thereafter furnish the petitioner with such information as to the entries and consignees of such merchandise, entered after the publication of the decision of the Secretary at such ports of entry designated by the petitioner in his notice of desire to contest, as will enable the petitioner to contest the appraised value or classification of, or rate of duty imposed upon or *failure to assess countervailing duties or antidumping duties upon, such merchandise* in the liquidation of one such entry at such port. The Secretary shall direct the appropriate Customs officer at such ports to notify the petitioner by mail immediately when the first of such entries is liquidated. [Emphasis added.]

(d) Within 30 days after a determination by the Secretary—

(1) under section 160 of this title, that a class or kind of foreign merchandise is not being, nor likely to be, sold in the United States at less than its fair value, or

(2) under section 1303 of this title, that a bounty or grant is not being paid or bestowed,

an American manufacturer, producer, or wholesaler of merchandise of the same class or kind as that described in such determination may file with the Secretary a written notice of a desire to contest such determination. Upon receipt of such notice the Secretary shall cause publication to be made thereof and of such manufacturer's, producer's, or wholesaler's desire to contest the determination. Within 30 days after such publication, such manufacturer, producer, or wholesaler may commence an action in the United States Customs Court contesting such determination.

(e) Notwithstanding the filing of an action pursuant to section 2632 of Title 28, merchandise of the character covered by the published decision of the Secretary (when entered for consumption or withdrawn from warehouse for consumption on or before the date of publication of a decision of the United States Customs Court or of the United States Court of Customs and Patent Appeals, not in harmony with the published decision of the Secretary) shall be appraised or classified, or both, and the entries liquidated, in accordance with the decision of the Secretary and, except as otherwise provided in this chapter, the final liquidations of these entries shall be conclusive upon all parties.

(f) The consignee or his agent shall have the right to appear and to be heard as a party in interest before the United States Customs Court.

(g) If the cause of action is sustained in whole or in part by a decision of the United States Customs Court or of the United States Court of Customs and Patent Appeals, merchandise of the character covered by the published decision of the Secretary, which is entered for consumption or withdrawn from warehouse for consumption after the date of publication of the court decision, shall be subject to appraisement, classification, and assessment of duty in accordance with the final judicial decision in the action, and the liquidation of entries covering the merchandise so entered or withdrawn shall be suspended until final disposition is made of the action, whereupon the entries shall be liquidated, or if necessary, reliquidated in accordance with the final decision.

(h) Regulations shall be prescribed by the Secretary to implement the procedures required under this section. (As amended Jan. 3, 1975, Pub.L. 93–618, title III, §§ 321(f)(1), 331(b), 88 Stat. 2048, 2052.)"

action for lack of subject matter jurisdiction. The district court held that since SCM could bring its action pursuant to section 516, it was within the exclusive jurisdiction of the United States Customs Court. In its decision, the district court also stated that the amendments to section 516 "provided in the Trade Act of 1974 reinforce the conclusion that Congress did not mean to deprive the Customs Court of its exclusive jurisdiction over customs matters." *SCM Corporation*, 404 F.Supp. at 130. Accordingly, the district court granted defendants' motion and dismissed the action. *Id.* at 132.

On appeal, the United States Court of Appeals for the District of Columbia Circuit expressed doubt on the jurisdictional question presented and stated:

"SCM has raised what are far from frivolous doubts concerning its ability to obtain review in the Customs Court pursuant to section 516(c). On the other hand, [the defendants] have urged upon us what appear to be quite possible constructions of the applicable statutes and legislative history." *SCM Corporation v. United States International Trade Commission et al.*, 179 U.S.App.D.C. 110, 549 F.2d 812, 821 (1977).

Hence, the court of appeals reversed the judgment dismissing SCM's action for lack of subject matter jurisdiction, and remanded the case to the district court. The remand contained the instruction that the district court retain jurisdiction until SCM had brought an action in the United States Customs Court to enable the Customs Court to determine whether it had jurisdiction to review a negative injury determination of the ITC in an American manufacturer's action brought under section 516.

Subsequently, SCM commenced an action in this court pursuant to section 516, and made the present motion to determine the court's subject matter jurisdiction. As indicated at the outset, the motion will be treated as a motion to dismiss for lack of subject matter jurisdiction. Thus, the question presented is whether under section 516 this court has jurisdiction to review a negative injury determination of the ITC in an

action brought by an American manufacturer.

■ There is no doubt that "agency action" is judicially reviewable, whether it is deemed affirmative or negative. *See City of Chicago v. United States*, 396 U.S. 162, 166–67, 90 S.Ct. 309, 24 L.Ed.2d 340 (1969); *Dunlop, Secretary of Labor v. Bachowski*, 421 U.S. 560, 566, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); *Deering Milliken, Inc. v. Johnston*, 295 F.2d 856 (4th Cir. 1961) and authorities cited. The issue, therefore, is not whether judicial review is available, but rather, the appropriate forum in which it may be sought.

SCM points out that there is no specific statutory provision that expressly grants jurisdiction to this court to review a negative injury determination by the ITC in an American manufacturer's action. It claims that there is no jurisdiction in this court since section 516(c) only provides for review to contest the Secretary's failure to assess antidumping duties.

SCM states that section 516(d) *expressly* provides for jurisdiction in this court to review *LTFV* determinations by the Secretary. Because this review was *expressly* provided for, while no express provision was made to review injury determinations by the ITC, SCM claims that "failure to assess antidumping duties" cannot include review of an ITC injury determination. According to SCM, if "failure to assess antidumping duties" were to be read to include injury determinations by the ITC, it would also include review of the Secretary's LTFV determinations, and that interpretation would make the specific provision for review of LTFV determinations unnecessary.

SCM believes that the legislative history supports its view that Congress never intended section 516 to provide review of negative injury determinations of the ITC. It also points to several prior judicial decisions which recognize that if there is no adequate remedy in this court, jurisdiction will be exercised by the district courts. SCM asserts that this principle is applicable here since this court is unable to provide an adequate remedy.

Defendant[4] maintains that SCM's demand is overly exacting in its requirement or expectation that the statute explicitly recite that negative injury determinations by the ITC are reviewable under section 516. It indicates that no statute *precludes* review in this court. According to the defendant, the "failure to assess" language of section 516(c) includes all preliminary determinations which enter into the Secretary's failure to assess dumping duties. The defendant emphasizes that only this interpretation fully supports and fosters the well-known national policy of providing for a uniform scheme of customs law through exclusive jurisdiction in this court. It also maintains that SCM is in error in asserting that this court cannot provide an adequate remedy.

In determining whether section 516 provides for review of a negative injury determination of the ITC, the court must first examine the actual language of the statute. Section 516 provides American manufacturers, producers and wholesalers with the procedure to contest the appraised value and classification of merchandise, the applicable rate of duty, and the failure to assess countervailing or antidumping duties.

If an American manufacturer believes that antidumping duties should be assessed, section 516(a) authorizes the manufacturer to file a petition with the Secretary setting forth a description of the merchandise, the duty it feels should properly be assessed, and the reasons for its belief that antidumping duties should be assessed. 19 U.S.C. § 1516(a). If the Secretary agrees with the American manufacturer, he complies with the procedure prescribed in the Antidumping Act. 19 U.S.C. § 1516(b).

If, however, the Secretary determines that the appraisement or duty assessment is correct, or that no antidumping duties should be assessed, section 516(c) expressly authorizes and prescribes the procedure for the American manufacturer to challenge the Secretary's decision. The Secretary must give notice of the first liquidation of the merchandise in question at a port or ports specified by the American manufacturer. Section 516(c) also expressly authorizes the manufacturer to contest the "failure to assess . . . antidumping duties upon, such merchandise in the liquidation of one such entry at such port [as designated by the American manufacturer]." 19 U.S.C. § 1516(c).

If the Secretary, in the course of his antidumping investigation, makes a determination of no sales at LTFV, section 516(d) expressly permits an American manufacturer directly to contest that *particular* determination without following the requirements of section 516(c).

SCM suggests that by enacting 516(d), Congress indicated it could provide explicitly for review of antidumping determinations. Hence, by failing to enact a specific provision for review of ITC determinations parallel to section 516(d), SCM asserts that Congress intended to preclude review. The court does not agree that Congress, by its failure explicitly to provide for review of ITC injury determinations in section 516(d), intended to preclude judicial review. The question presented pertains to the intent of Congress as gleaned from the entire statutory scheme of section 516.

The language of section 516(c) that permits an American manufacturer to contest "the failure to assess . . . antidumping duties" contains no limitations, and is sufficient to include a challenge to the preliminary determinations that go into a decision to assess, or not to assess, dumping duties. Admittedly, there is no language in section 516, or elsewhere that would preclude review of ITC determinations under section 516. SCM nonetheless asserts that the purpose of its action is not the assessment of dumping duties, but the cessation

4.   Under 19 U.S.C. § 1516(f) (note 3 *supra*), the consignee or his agent has the right to appear and be heard as a party in interest in an action brought by an American manufacturer pursuant to section 516. In the present action, Brother International Corporation has exer-
cised this right to appear and be heard as a party in interest. Because the arguments of the defendant and the party in interest are substantially similar, the term "defendant" includes the arguments of both, unless stated otherwise.

of injurious "dumping." Therefore, it asserts that, under the provisions of section 516(c), it cannot obtain review of the failure to assess dumping duties.

To achieve its objection, SCM claims that dumping duties need not be assessed. It feels that the publication of a dumping finding, which would authorize the imposition of dumping duties when a margin of dumping exists, would remove any incentive to "dump." The mere publication of a dumping finding, however, cannot provide the relief SCM seeks. Only the imposition of dumping duties, if warranted, will end dumping. No matter how characterized or phrased by SCM, what is ultimately at issue is the appraised value of the imported merchandise.

The present version of section 516 was enacted as part of the Trade Act of 1974, Pub.L.No.93–618, 88 Stat. 2052 (1975) (now codified as 19 U.S.C. § 1516). Under the prior scheme of section 516, an American manufacturer was afforded the right to contest in this court valuation determinations by the Secretary. Tariff Act of 1930, ch. 497, Title IV, § 516, 46 Stat. 735 (1930). Under that provision, it was held that an American manufacturer could contest the Secretary's determination of no sales at LTFV in an antidumping investigation. *North American Cement Corp. v. Anderson,* 109 U.S.App.D.C. 162, 284 F.2d 591 (1960). In another case, however, a decision of the Court of Customs and Patent Appeals questioned the correctness of this determination. In *Hammond Lead Products, Inc. v. United States,* 63 Cust.Ct. 316, C.D. 3915, 306 F.Supp. 460 (1969), this court had held that, under section 516, it had jurisdiction to review a negative countervailing duty determination by the Secretary. The Court of Customs and Patent Appeals, however, reversed and held that a countervailing duty was a penalty and therefore not within the scope of section 516. *United States v. Hammond Lead Products, Inc.,* 440 F.2d 1024, 58 CCPA 129, C.A.D. 1017 (1971), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 565, 30 L.Ed.2d 558 (1971).

The 1974 Trade Act amendments were designed to nullify the holding of the *Hammond Lead Products* case, and specifically authorized review of negative countervailing duty determinations within section 516. H.R.Rep.No.93–571, 93d Cong., 1st Sess. 76 (1973). By providing for judicial review, Congress intended "to assure effective protection under the countervailing duty laws to American producers." S.Rep.No.93–1298, 93d Cong., 2d Sess. 185 (1974), U.S. Code Cong. & Admin.News 1974, pp. 7186, 7320. As part of the wide-ranging reforms effected by the Trade Act of 1974, Congress amended the Antidumping Act and the antidumping provisions of section 516. The House did not include a specific provision for judicial review of negative antidumping determinations in its version of the bill because no judicial decision seemed to have made it necessary. Indeed, as indicated by the following statements from the House Report, it felt that judicial review under section 516 was already available to an American manufacturer:

"It will be noted in the following section that section 516 of the Tariff Act of 1930 is amended to specifically permit judicial review of negative countervailing duty determinations. The committee has been informed by letter from the Secretary of the Treasury that domestic producers do have the right of judicial review in antidumping cases. *The committee wishes to make it clear that the absence of amendments to section 516 with respect to antidumping cases should not be considered to mean that negative antidumping findings are not subject to review.* The committee is in agreement with the letter." H.R.Rep.No.93–571, at 73. (Emphasis added.)

The letter referred to in the House Report based its conclusion that judicial review of negative antidumping determinations was already available on the holding of the *North American Cement* decision. In the opinion of the Secretary of the Treasury, *Hammond Lead Products* did nothing to cast doubt upon the reviewability of negative antidumping determinations since that

**1186**

decision was predicated on the conclusion that *countervailing duties* were penal in nature, and the Secretary believed that dumping duties were not penal but ordinary duties.[5]

As may be gleaned from the following committee report, the Senate Finance Committee, although with some doubt, generally agreed with the opinion expressed in the House Report:

> "*Equal Judicial Review Rights for Domestic Producers.—* . . . The House report makes references to an informal opinion of the Treasury Department which asserts that existing law provides for judicial review of negative antidumping decisions on the part of the U. S. manufacturers, producers, or wholesalers. *The Committee generally agrees with this opinion.* However, it is the view of the Committee that since some question remains as to the ability of American manufacturers, producers, and wholesalers to obtain judicial review of negative antidumping determinations under section 516 of the Tariff Act of 1930, the law ought to be explicit on this point. The Committee believes it essential that domestic producers have the right to judicial review of negative price discrimination (LTFV) determinations, just as foreign producers and importers have the right to obtain judicial review of positive price discrimination (LTFV) determinations.
>
> The Committee, therefore, added [a] new subsection . . . to provide *explicitly* for judicial review of negative antidumping determinations made by the Secretary of the Treasury. . . ." S.Rep.No.93–1298, 93d Cong., 2d Sess. 178, *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 7314–15. (Emphasis added in part.)

The new subsection added by the Senate is embodied in section 516(d), and, in antidumping cases, provides for judicial review of determinations by the Secretary that there have been no sales at LTFV. It does not explicitly provide for review of negative injury determinations by the ITC, or failure of the Secretary to assess dumping duties because no margin of dumping was found.

When the bill reached the full Senate, several amendments were made before passage. The present language of section 516(c), providing for review of the Secretary's failure to assess antidumping duties, was added by Amendment No. 2051. The following statement by Senator Long, who introduced this amendment, is particularly pertinent: "Mr. President, *this amendment permits a manufacturer to review on an identical basis* negative countervailing duty and antidumping determinations of the Secretary of the Treasury. It is more or less a *conforming amendment* to carry out the intent of the bill. [Emphasis added]." 120 Cong.Rec. 39839 (1974). *See* H.R. 10710, 93d Cong., 2d Sess. § 331(b) (Amendment Nos. 364–67) (Dec. 13, 1974) (Approved Jan. 3, 1975).

Surely, there is no indication that Congress intended to *preclude* review of ITC injury determinations under section 516. The Senate Report basically agreed with the opinion of the House that the existing law provided for judicial review of negative antidumping determinations. The Finance Committee, however, considered it essential that American manufacturers have the right to judicial review of negative LTFV determinations by the Secretary, and thus drafted what is now section 516(d) explicitly to provide for judicial review. It made no provision for judicial review of *other* aspects of negative antidumping determinations. S.Rep.No.93–1298. Amendment No. 2051, which added review of failure to assess antidumping duties to section 516(c), was added to *conform* the review of antidumping duties with the provisions for review of countervailing duties. This legislative intent is shown not only by the remarks of Senator Long, but also by the classification given the amendment by the

---

**5.** The letter is contained in full in the opinion of the court of appeals in *SCM Corporation v. United States International Trade Commission et al.,* 179 U.S.App.D.C. 110, 549 F.2d 812, 816, n.9 (1977). *See* plaintiff's exhibit 7.

Conference Committee. The House agreed to the amendment without comment as a conforming amendment. Conf.Rep.No.93–1644, 93d Cong., 2d Sess. 1, 21, *joint explanatory statement of the committee of conference, reprinted in* [1974] U.S.Code Cong. & Admin.News, p. 7367.

Before countervailing duties may be assessed, the Secretary must determine whether a bounty or grant has been bestowed on the imported merchandise by a foreign government. Countervailing duty determinations are usually made by the Secretary without assistance from the ITC. However, where the merchandise is normally duty-free, an affirmative injury determination by the ITC is required before the Secretary may assess a countervailing duty. 19 U.S.C. § 1303(b) (Supp. V 1975). In this instance, the requirements to impose countervailing duties are closely parallel to those required to impose dumping duties. It has been observed that the countervailing duty law and the antidumping statute are "opposite sides of the same coin." King, *Countervailing Duties—An Old Remedy With New Appeal,* 24 Bus.Law. 1179, 1181 (1969).

The language of section 516(c) is identical for countervailing duty and antidumping duty cases. If an American manufacturer is dissatisfied with the decision of the Secretary, it may contest the "failure to assess countervailing duties or antidumping duties upon, such merchandise . . . ." 19 U.S.C. § 1516(c).

It is clear that Congress intended to extend review under section 516(c) to encompass *all* issues embodied in the failure to assess countervailing duties. The House Report expressly stated that the amendment to section 516(c) would "provide for judicial review of negative countervailing duty determinations by the Secretary of the Treasury." H.R.Rep.No.93–571, at 76. SCM, however, argues that the phrase "determinations by the Secretary," as used in the House Report, and by Senator Long in introducing Amendment No. 2051, shows a

congressional intent to limit review under section 516, in both antidumping and countervailing duty cases, to those determinations actually made by the Secretary. SCM contends that this phrase shows that Congress did not intend review under section 516 to encompass decisions underlying determinations made by the Secretary. The House Report, however, used the phrase in the very section where it discussed the requirement that an injury determination be made by the ITC before the Secretary could assess countervailing duties on otherwise nondutiable merchandise. Therefore, the phrase "determinations by the Secretary," as used in the legislative history, refers to *any* factor or finding that would enter into the failure of the Secretary to assess countervailing or antidumping duties. It was not intended to be limited solely to determinations actually made by the Secretary.

Section 516(c) does, therefore, provide for review of a negative injury determination by the ITC, when necessary, in a countervailing duty action brought by an American manufacturer. Compliance with the stated intent of Congress, to provide review of negative countervailing duty determinations and negative antidumping duty determinations "*on an identical basis*" requires that section 516(c) be interpreted to afford review of all issues in antidumping cases. This should include review of negative injury determinations of the ITC, as well as all issues in countervailing duty cases. Any other interpretation would do violence to the stated intention to attain in dumping cases "conformity" and "identical" treatment with countervailing duty cases.

Section 516(d) expressly provides for judicial review of a determination by the Secretary that a bounty or grant has not been paid or bestowed in countervailing duty cases (19 U.S.C. § 1516(d)(2)),[6] as well as review of the Secretary's determination that there have been no LTFV sales in antidumping cases. 19 U.S.C. § 1516(d)(1). SCM claims that section 516(d) indicates an intent to preclude review of ITC determina-

---

6. This provision was added to subsection (d) as part of Amendment No. 2051. 120 Cong.Rec. 39839 (1974).

tions under section 516(c) on the basis that Congress did not consider a challenge of the Secretary's negative LTFV determination to be a challenge of the decision not to assess dumping duties. The court does not agree with plaintiff's contention because the expressed intention of Congress was to authorize review of negative antidumping determinations and negative countervailing duty determinations on an identical basis. 120 Cong.Rec. 39839 (1974) (remarks of Sen. Long). The House Report manifests an intent that section 516(c) should provide review of *all* issues embodied in the failure to assess countervailing duties. The provisions of section 516(d) merely provide a more expeditious form of review of one specific issue in antidumping cases, and for one specific issue in countervailing duty cases. Nowhere is there any indication that this additional section was intended to limit the broad general language of section 516(c). *See* S.Rep.No.93–1298 and Conf. Rep.No.93–1644, at 44.

■ The conclusion that Congress intended section 516 to include review of a negative injury determination by the ITC in an action brought by an American manufacturer is fully supported by the expressed intention of the amendments to the Trade Act of 1974. Senator Long stated that the purpose of Amendment No. 2051, which added antidumping review to section 516, was "to carry out the intent of the bill." 120 CONG.REC. 39839 (1974). It is clear that one of the purposes of trade act amendments was to provide American manufacturers with judicial review equal to that available to importers which entitled them to contest the actual assessment of countervailing or antidumping duties. *See* H.R.Rep.No.93–571, at 76; S.Rep.No.93–1298. This court and the Court of Customs and Patent Appeals have regularly exercised jurisdiction in actions brought by American importers to contest affirmative injury determinations by the ITC.[7] *See, e.*

g., *Imbert Imports, Inc. v. United States,* C.A.D. 1094, 475 F.2d 1189, 60 CCPA 123 (1973); *City Lumber Co. v. United States,* 457 F.2d 991, 59 CCPA 89, C.A.D. 1045 (1972); and *Ellis K. Orlowitz Co. v. United States,* 50 CCPA 36, C.A.D. 816 (1963).

■ The intent to provide judicial review of these questions, "equally" to American manufacturers and importers, is in harmony with the well recognized national policy that this court was established by Congress to provide a complete system of justice in the administration of customs law. It is also generally acknowledged that "questions involving the validity of official action in the imposition and collection of duties are properly cognizable before [the Customs Court] to the exclusion of other courts." *David L. Moss Co. v. United States,* 103 F.2d 395, 397, 26 CCPA 381, 383, C.A.D. 45 (1939).

Many cases may be cited to show that the courts have judicially noticed the congressional intention that civil litigation pertaining to customs matters should be conducted exclusively in the Customs Court. For example, the United States Court of Appeals for the Ninth Circuit, referring to the exclusive jurisdiction of the Customs Court, recently stated:

"Even when other, broadly-worded statutes seem to confer concurrent jurisdiction on the district courts, the exclusivity of Customs Court jurisdiction reflects the policy of paramount importance which overrides the literal effect of such statutes . . . ." *Fritz v. United States,* 535 F.2d 1192, 1195 (9th Cir. 1976).

*See also: David L. Moss Co. v. United States, supra; J. C. Penney Co. v. United States Treasury Department,* 439 F.2d 63 (2d Cir. 1971), *cert. denied,* 404 U.S. 869, 92 S.Ct. 60, 30 L.Ed.2d 113 (1971); *Patchogue-Plymouth Mills Corp. v. Durning,* 101 F.2d 41 (2d Cir. 1939); *Cottman v. Dailey,* 94 F.2d 85 (4th Cir. 1938).

7. The ITC, formerly known as the United States Tariff Commission, was established by the Tariff Act of 1930, ch. 497, § 330, 46 Stat. 696 (1930). Its name was changed to the Unit-

ed States International Trade Commission by the Trade Act of 1974, Pub.L.No.93–618, § 171, 88 Stat. 2009 (1975).

In the *North American Cement* case, 109 U.S.App.D.C. 162, 284 F.2d 591 (1960), the United States Court of Appeals for the District of Columbia Circuit also acknowledged the exclusive jurisdiction of the Customs Court. In affirming the dismissal by the district court of the American manufacturer's complaint for lack of subject matter jurisdiction, the circuit court reviewed several of its previous holdings on this question:

"In *Morgantown Glassware Guild v. Humphrey*, we read 28 U.S.C. § 1583 [now 1582] as providing without limitation that ' "The Customs Court shall have exclusive jurisdiction to review on protest the * * * rate and amount of duties chargeable and as to all exactions of whatever character within the jurisdiction of the Secretary of the Treasury * * *." ' 98 U.S.App.D.C. 375, 376, 236 F.2d 670, 671 [1956]. In *Boston Wool Trade Ass'n v. Snyder*, we said: 'It is clear that the controversy concerns the duty to be imposed upon certain imports. As such, it is within the exclusive jurisdiction of the Court of Customs and Patent Appeals.' 82 U.S.App.D.C. 144, 145, 161 F.2d 648, 649 [1947]." 284 F.2d at 592.

The same national policy led to the establishment of the Court of Customs Appeals, the predecessor of the present United States Court of Customs and Patent Appeals. *See, e. g.,* 44 Cong.Rec. 4189, 4190, 4195–96, 4199, 4201–02, 4208, 4213–14, 4215, 4697 (1909).

Congress established the Customs Court to provide uniformity and consistency in the interpretation and application of the customs laws. *J. C. Penney Co.,* 439 F.2d at 65–66. By the recent amendments of the Trade Act of 1974, Congress further demonstrated its intention that the Customs Court should provide an exclusive and uniform interpretation of customs laws by superseding the *Hammond Lead Products* case, which had held that negative countervailing duty determinations were not reviewable in this court. *See* H.R.Rep.No.93–571, at 76.

Questions of uniform national application must be resolved by an interpretation of the governing statute that effectuates the intended purpose of the Congress. *See NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); *Rogers v. Missouri Pacific Ry.,* 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957); *Textile Workers Union of America v. Lincoln Mills of Alabama,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). In the *Hearst Publications* case, it was contended that newsboys were not required to bargain because they were not within the meaning of "employees" under the National Labor Relations Act. The Supreme Court held that the term "employees," as used under that Act, was to be interpreted in accordance with the intended purpose of the statute, and not by resort to the common law relation of "master-servant." The national purpose of the Act could only be achieved by a broadened definition of the word "employees" since, clearly, Congress did not legislate "solutions only partially effective." 322 U.S. at 120–32, 64 S.Ct. 851. Similarly, the language of section 516(c) must be interpreted to effectuate the congressional intent that the customs laws of the nation be interpreted and applied with uniformity and consistency.

This intent, to make the United States Customs Court the exclusive tribunal for the interpretation and application of the customs laws, is particularly significant because it finds its genesis not only in congressional enactments, but also in the constitutional mandate that "all Duties, Imposts and Excises shall be uniform throughout the United States." U.S.Const. art. I, § 8. To accept SCM's contention that this court is without jurisdiction to review injury determinations by the ITC under section 516 does violence to the constitutional requirement of uniformity, and the legislative history surrounding the recent amendments to section 516.

It is not disputed that an importer can seek review in this court of the assessment of antidumping duties, including all determinations that underlie the assessment.

An importer can challenge the Secretary's finding of sales at LTFV, the ITC's affirmative determination of injury, the determination by the Customs Service that the merchandise is of the class or kind subject to dumping duties, and that a dumping margin exists. It is also not disputed that an American manufacturer can seek review in this court of the Secretary's determination of no sales at LTFV, the determination by the Customs Service that the merchandise is not of the class or kind subject to dumping duties, and the Customs Service's determination that no dumping margin exists. In short, it is undisputed that all the issues that can be raised by an importer in an antidumping action in this court can also be raised in a similar action by an American manufacturer with the sole exception of negative injury determinations by the ITC.

SCM seeks a determination whether jurisdiction over this particular antidumping question is in this court or in the district courts. To agree with the contention that jurisdiction exists in the district courts is to permit potentially conflicting determinations of the same issues by the various district courts. It is precisely this possibility of differing interpretations that Congress sought to avoid by establishing the United States Customs Court.

█ It is clear that this court has jurisdiction, and may apply its expertise in customs and tariff matters to ITC determinations in actions brought by importers. To be unable to utilize this same expertise in the same type of questions only because the action is brought by an American manufacturer would be unreasonable and anomalous. It is inconceivable that Congress could have intended such a result. Chief Justice Marshall, writing of the "well established principle in the exposition of statutes, that every part is to be considered, and the intention of the legislature to be extracted from the whole," added that: "It is also true, that where great inconvenience will result from a particular construction, that construction is to be avoided, unless the meaning of the legislature be plain; in which case it must be obeyed." *United*

*States Fisher*, 6 U.S. (2 Cranch) 358, 386, 2 L.Ed. 304 (1805). "It has been called the golden rule of statutory interpretation that unreasonableness of the result produced by one among alternative possible interpretations of a statute is reason for rejecting that interpretation in favor of another which would produce a reasonable result." 2A Sands, Sutherland Statutory Construction § 45.12, at 37 (4th ed. 1973). *See Commissioner of Internal Revenue v. Brown*, 380 U.S. 563, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965); *Lange v. United States*, 143 U.S.App.D.C. 305, 443 F.2d 720 (1971); *Cohn & Rosenberger v. United States*, 4 CCPA 378, T.D. 33536 (1913).

The whole purpose of the legislative effort underlying the 1974 Trade Act amendments was to give identity of rights to importers and American manufacturers. Any other interpretation would attribute to Congress the permitting of an intolerable anomaly, vitiating its expressed intention of equality for both classes. As stated in the dissenting appellate opinion of *Hammond Lead Products*, which now represents the law:

> "If an importer may protest the decision of the Secretary of the Treasury finding a bounty or grant, why shouldn't an American manufacturer be permitted to protest the decision of the Secretary of the Treasury finding no bounty or grant? . . . They are . . . protesting a decision of the Secretary of the Treasury as they are clearly permitted to do under either section 514 or 516, depending on whether it is a protest by an importer or by an American manufacturer." 440 F.2d at 1035, 58 CCPA at 144.

This fortifies the concept that what is involved in antidumping and countervailing cases, whether the complaint is that of an importer or an American manufacturer, is the classification and/or the rate of duty of imported merchandise.

There is no doubt that it was the intent of Congress to provide judicial review to American manufacturers under section 516. The interpretation that judicial review of negative injury determinations by the ITC

is available in the United States Customs Court under section 516 fulfills the intent of Congress, and effectuates the national policy of fostering expertise and uniformity in the interpretation and application of the customs laws.

SCM nonetheless contends that even though the policy of uniformity in the interpretation and application of the customs laws requires exclusive jurisdiction to be vested in the United States Customs Court, this action nevertheless comes within the recognized judicial exception that if adequate relief cannot be obtained in this court, jurisdiction lies in the district courts. *J. C. Penney Co. v. United States Treasury Department,* 439 F.2d 63 (2d Cir. 1971), *cert. denied,* 404 U.S. 869, 92 S.Ct. 60, 30 L.Ed.2d 113 (1971); *United States v. Hammond Lead Products, Inc.,* 58 CCPA 129, C.A.D. 1017, 440 F.2d 1024 (1971); *Timken Co. v. Simon,* 176 U.S.App.D.C. 219, 539 F.2d 221 (1976).

Citing the *Timken* case, SCM argues that if it proceeded under section 516, it could not obtain an adequate remedy. Since section 516(c) provides for the challenge to the nonassessment of dumping duties on only one entry, SCM claims that there is no assurance that by following section 516(c) it can obtain review of the ITC's negative injury determination. It suggests that by providing review procedures in section 516(d), for the review of the Secretary's LTFV determinations that are different from the provisions of section 516(c), Congress indicated that it would be too burdensome to follow section 516(c) procedures in challenging negative injury determinations.

In the *Timken Co.* case, the court indicated that section 516(c)—

"is designed to enable American manufacturers to challenge substantive decisions by the Secretary with respect to the need for or the amount of anti-dumping duties. The section is structured to enable the petitioning manufacturer to challenge one entry per port, and *to use that entry as a vehicle to obtain Customs Court review of the merits of the Secre-*

*tary's determination.*" (Emphasis added.) *Timken Co.,* 539 F.2d at 225–26.

■ The judicial exception to the exclusive jurisdiction of the Customs Court, which vests jurisdiction with the district courts when this court cannot grant an adequate remedy, finds expression in the *J. C. Penney Co.* case. In that case, an American importer sought declaratory and injunctive relief to prevent the Treasury Department from conducting an investigation under the Antidumping Act to determine whether there were LTFV sales of the importer's products. The court observed that—

"[i]t is further urged that even acknowledging that generally exclusive jurisdiction over constitutional issues is vested in the Customs Court, there nevertheless exists a recognized judicial exception to this statutory rule when no adequate relief may be obtained in that court. We do not dispute the existence of such an exception. See, e. g., *Waite v. Macy,* 246 U.S. 606, 38 S.Ct. 395, 62 L.Ed. 892 (1918)." *J. C. Penney Co. v. United States Treasury Department,* 439 F.2d at 68.

Although recognizing the existence of the exception to the "generally exclusive jurisdiction" of the Customs Court, the court held that the exception was inapplicable. In effectuating the intent of Congress, and the "broad national policy" which prompted the grant of exclusive jurisdiction to the Customs Court, the court noted that the "proper administration of the customs laws requires a complete, integral, smooth-functioning system of customs law justice." 439 F.2d at 66. Although the Customs Court lacked the equitable power to grant the relief plaintiff sought, the remedy that the Customs Court could grant was nevertheless deemed adequate. The court stated:

"Thus the only remedy available to Penney [in the Customs Court] is the obtaining of refunds of special dumping duties which may have been improperly assessed and paid. Though it may be true that the ordering of a hearing would be a

more desirable form of relief from Penney's point of view than the obtaining of refunds, the mere fact that more desirable remedies are unavailable does not mean that existing remedies are inadequate. We conclude that there is, in fact, an adequate remedy available to Penney in the Customs Court." 439 F.2d at 68.

In *Waite v. Macy*, 246 U.S. 606, 38 S.Ct. 395, 62 L.Ed. 892 (1918), cited by the court in the *J. C. Penney Co.* case, the issue was not whether the plaintiff could obtain an adequate remedy within the statutory jurisdiction of the Secretary of the Treasury and the Board of General Appraisers. Rather, the question presented was whether the Secretary of the Treasury and the board had exceeded their jurisdiction by applying criteria not enumerated in the statute. In that case, pursuant to a regulation of the Secretary of the Treasury, the board had excluded certain imported tea on the ground that it contained added coloring. The pertinent statute restricted the board's power to determinations on the purity, quality or fitness for consumption. The Supreme Court held that the board exceeded its statutory jurisdiction in applying criteria not spelled out in the statute. Mr. Justice Holmes, writing for the Court, stated:

"No doubt it is true that this Court cannot displace the judgment of the board in any matter within its jurisdiction, but it is equally true that the board cannot enlarge the powers given to it by statute and cover a usurpation by calling it a decision on purity, quality or fitness for consumption." 246 U.S. at 608–09, 38 S.Ct. at 396.

The Court of Customs and Patent Appeals has acknowledged that the district courts may have jurisdiction over customs cases where the plaintiff has no remedy in the Customs Court. In the *Hammond Lead Products* case, an American manufacturer claimed that section 516, prior to the Trade Act of 1974 amendments, provided for judicial review in the Customs Court of the Secretary's failure to assess countervailing duties. Although the Court of Customs and Patent Appeals held that section 516 did not confer jurisdiction on the Customs Court to review negative countervailing duty determinations of the Secretary in actions brought by American manufacturers, the following statements of the appellate court are nevertheless pertinent to the question of an available remedy in the Customs Court:

"The Second Circuit, in *J. C. Penney Company, Inc. v. United States*, [citation omitted], has considered the new statute and reaffirmed holdings under the old, that the regular Federal courts will not interfere in customs cases reviewable in the Customs Court, because an importer desires to tailor a remedy more satisfactory to him than the Customs Court affords. A case of an American Manufacturer having no remedy at all in the Customs Court is greatly different. . . [I]t could be the regular [Federal] courts would take jurisdiction in cases outside [the scope of the Customs Court's jurisdiction]." *Hammond Lead Products, Inc.*, 440 F.2d at 1032, 58 CCPA at 140–41.

SCM cites *Timken Co. v. Simon*, 176 U.S. App.D.C. 219, 539 F.2d 221 (1976) in support of its contention that it does not have an adequate remedy through section 516. In the *Timken Co.* case, the plaintiff, an American manufacturer, pursuant to section 516, submitted a complaint that tapered roller bearings from Japan were being "dumped" in the United States. After investigating Timken's charges, the Secretary, on June 5, 1974, pursuant to 19 U.S.C. § 160(b), published a notice withholding appraisement, and on September 6, 1974, published a determination of LTFV sales. On January 23, 1975, the ITC rendered an affirmative injury determination. At this point the Secretary would normally publish a "dumping finding," and all unappraised tapered roller bearings from Japan entered, or withdrawn from warehouse, for consumption not more than 120 days before October 31, 1973 (the date the Secretary received Timken's complaint) would be subject to the imposition of dumping duties. The Secretary, however, did not follow this course.

Instead, he directed the customs officials to appraise the merchandise covered by the withholding notice, thus removing those entries from possible imposition of dumping duties.

The United States Court of Appeals for the District of Columbia Circuit affirmed a finding of jurisdiction in the district court on the ground that section 516 could not provide review of Timken's complaint that the Secretary acted beyond his authority in revoking the withholding of appraisement notice, and ordering appraisement of the merchandise prior to publication of a dumping finding. The court held that section 516 provided review of substantive decisions by the Secretary with respect to antidumping duties through the review of certain entries occurring *after* the date of the Secretary's adverse ruling. (*See* section 516(c), *supra* note 3.) The question presented by Timken's complaint was beyond the scope of section 516 because it concerned entries made before the date of the Secretary's adverse determination. The court, therefore, concluded that "[s]ince *Timken* has *no remedy* pursuant to section 516 in the Customs Court, we decline to hold that the District Court lacked jurisdiction over this action." *Timken Co.*, 539 F.2d at 226, n. 7 (emphasis in original).

Thus, although the *J. C. Penney Co.* case recognized that the exception to the generally exclusive jurisdiction of the Customs Court vests jurisdiction in the district courts when this court cannot grant an adequate remedy, the court held that an adequate remedy was available in the Customs Court. The *Hammond Lead Products* and *Timken Co.* cases held that the Customs Court could grant *no remedy* because the statutory scope of its jurisdiction did not extend to the respective issues presented in those cases.

The United States Court of Appeals for the Second Circuit recently considered this jurisdictional question in a case that came within the exception to the exclusive jurisdiction of the Customs Court. In *Sneaker Circus, Inc., et al. v. Carter et al.*, 566 F.2d 396 (2d Cir. 1977), the plaintiff importers sought to attack the validity of certain trade agreements which limited the quantity of footwear exported from the Republic of Korea and the Republic of China to the United States. No footwear could be exported to the United States unless the exporter obtained a visa from his government approving the exportation.

To obtain judicial review in the Customs Court, pursuant to section 514, Tariff Act of 1930, as amended, the plaintiffs must have protested the denial of entry of footwear exported from the Republic of China and the Republic of Korea by a specific administrative ruling made at a United States port of entry. Only when that particular protest had been denied in accordance with the provisions of section 515, Tariff Act of 1930, as amended, could the jurisdiction of the Customs Court be invoked. However, without obtaining a visa from the exporting country, it was doubtful whether the plaintiffs would ever be able to export footwear from the Republic of Korea and the Republic of China to test the denial of entry into the United States. The export visa could only be granted under the terms of the trade agreements which the plaintiffs were seeking to challenge. To attempt to export goods without a visa, and in violation of the export limits, subjected the foreign exporter to "heavy civil and criminal sanctions in the country of export." *Sneaker Circus, Inc., et al.*, 566 F.2d at 399. Under these circumstances, the United States Court of Appeals concluded there was "every likelihood that the agreements will be effectively enforced abroad, with the result that no occasion for protest under section 514 will ever present itself, and no Customs Court jurisdiction . . . will arise." *Id.* Therefore, although section 514 *could* have afforded review in the Customs Court, it was *probable* that the jurisdictional prerequisites under section 514 would never be met, thus effectively precluding judicial review.

In the case at bar, none of the circumstances that would warrant the exercise of jurisdiction by the district courts is present. Unlike the *Hammond Lead Products* and

*Timken Co.* cases, the issue raised by SCM's complaint, i. e., the correctness of the ITC's negative injury determination, is covered by the statutory scope of this court's jurisdiction under section 516(c). Unlike the plaintiffs in the *Sneaker Circus* case, SCM has already met the jurisdictional prerequisites of section 516(c). Thus, this court is in a position to grant an appropriate remedy to SCM if it should prevail on the merits.

In view of the foregoing, it is the determination of this court that it has jurisdiction over the subject matter of this action. Consequently, SCM's motion, which is treated as a motion to dismiss for lack of subject matter jurisdiction, is denied.

The court is aware that the issue presented upon this motion should be finally resolved as expeditiously as possible. Accordingly, pursuant to the provisions of 28 U.S.C. § 1541(b) and Rule 13.2 of the rules of this court, the court concludes that an immediate appeal from this order may materially advance the ultimate determination of the litigation.